# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
January 24, 2013 Session

## IN RE: SELENA V. AND LILIANA V.

**Appeal from the Juvenile Court for McMinn County**
**No. 2011-JV-96     James F. Watson, Judge**

---

**No. E2012-01854-COA-R3-PT-FILED-FEBRUARY 14, 2013**

---

The State of Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for McMinn County ("the Juvenile Court") seeking to terminate the parental rights of Jennifer K. ("Mother") to the minor children Selena V. and Liliana V. ("the Children"), born in 2007 and 2008 respectively.[1]  After a trial, the Juvenile Court terminated the parental rights of Mother to the Children after finding that the ground of persistent conditions pursuant to Tenn. Code Ann. § 36-1-113 (g)(3) had been proven by clear and convincing evidence, and that clear and convincing evidence had been shown that it was in the Children's best interest for Mother's parental rights to be terminated.  Mother appeals to this Court.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and JOHN W. MCCLARTY, J., joined.

Evan A. Walden, Athens, Tennessee, for the appellant, Jennifer K.

Robert E. Cooper, Jr., Attorney General and Reporter; and, Derek C. Jumper, Assistant Attorney General; for the appellee, Tennessee Department of Children's Services.

Derek T. Green, guardian ad litem.

---

[1]The petition also sought to terminate the parental rights of the Children's father, Yonis V.  Yonis V. apparently never was served.  This appeal concerns only the termination of Mother's parental rights to the Children.

# OPINION

## Background

In July 2009, the Children entered DCS custody upon allegations of Mother's drug use and mental health problems. DCS filed a petition to adjudicate dependency and neglect and for temporary legal custody. In September 2009, the Juvenile Court heard DCS's petition. Mother waived her rights to a hearing and agreed with the removal. Several permanency plans were developed in the ensuing period with the goal of Mother regaining custody of the Children if she met certain conditions. As relevant to this appeal, Mother was required to do, among other things, the following: take her medication as prescribed; engage in treatment for anger issues; and, refrain from threatening anyone. In February 2011, DCS filed a petition seeking to terminate Mother's parental rights to the Children. In its petition, DCS alleged three grounds for terminating Mother's parental rights: 1) failure to provide a suitable home; 2) substantial noncompliance with permanency plan; and, 3) persistent conditions. DCS also alleged that terminating Mother's parental rights to the Children was in their best interest.

The first hearing in this case was in June 2011. First to testify was Tiffany Miller ("Miller"). Miller was a child protective service investigator with DCS. Miller removed the Children from Mother's custody in 2009 on the basis of Mother's drug use and mental instability. Miller stated that Mother tested positive for methamphetamine. Miller further testified that Mother revealed that she suffered from schizophrenia, depression, and being bipolar. According to Miller, during one visit, Mother started "beating her chest and threatening to kill herself. That's when we moved the children."

Lisa Blankenship ("Blankenship"), a family service worker with DCS who had worked to prevent the Children's removal in 2009, testified. Blankenship stated that DCS assisted Mother with rent and utility payments. Overall, Blankenship worked to help Mother improve her situation, which was apparently at least somewhat successful. Mother eventually found work.

Donna S., a manager at Zaxby's, testified to Mother's employment there. Mother had worked intermittently at Zaxby's since July 2010. Donna S. testified that Mother had an "eye for detail" and was a good employee. Donna S. testified that when Mother began taking the drug Strattera, Mother got very moody and antsy. When Mother stopped taking that medication, her mood began to improve. Donna S., who had been a foster mother herself, stated that Mother's relationship with the Children could be classified as "an amazing love."

-2-

Terri Murr Block ("Block"), a clinical social worker at Cherokee Health Systems, testified. Block treated Mother beginning in February 2011. Mother had been diagnosed as bipolar. Block testified to a variety of medicines that had been prescribed for Mother, including Strattera. Block described some of Mother's issues: "[S]he stated that she felt like people were out to get her. It didn't make her want to attack anybody or anything like that. She just felt like she - - I think that's when she was working at Zaxby's. She felt like everybody was watching her and people were out to get her . . . ." Block also testified that Mother threatened to kill herself and others. Block stated that Mother told her that she yelled and cursed at the Children and could not help it. Block testified that Mother said this was alright, as the Children did not know what the words meant. According to Block, Mother said she would kill herself if DCS kept custody of the Children. Mother told Block that she had used methamphetamine to boost her energy to do housework. Block testified that Mother's mental health issues potentially could be lifelong in nature. Block stated that more time was needed to observe how Mother behaved off her medications. Nevertheless, Block testified that Mother had been compliant overall with Cherokee Health Systems's recommendations, and that she had improved.

Mother testified. Mother responded to a series of questions about a litany of alleged behaviors. Mother acknowledged having threatened to kill herself. Mother further acknowledged actually having tried to kill herself before. Mother had cut herself, as well. Mother testified that she had used methamphetamine, marijuana, and cocaine in the past. Mother denied, however, that she continued to use drugs. Mother stated that during Easter of 2010, she broke the Children's Easter basket after an argument with her mother in which she spat on and hit her mother. Nevertheless, Mother testified to an "amazing" relationship with the Children.

The hearing then was suspended and continued based on the lateness of the hour. After this continuation, DCS awarded Mother a trial home visit with the Children. However, because of certain statements made by Mother to Block while the trial home visit was ongoing, DCS later filed a motion to terminate the trial home visit. DCS resumed its prosecution of the petition to terminate parental rights, and trial resumed in March 2012. Mother filed a motion to dismiss, arguing that the delay in the trial infringed on Mother's due process rights.

Block testified about the incident that led to the termination of the trial home visit. Block read from her notes as to what Mother said:

They do everything to piss me off. I fought for two years to get them
back, and it's been more of a burden than anything. I try to sit down and color

with them, but Selena bitched and whined the entire time. I told her to shut her fucking mouth and stop bitching about every little thing.

***

They don't think I will do anything to them, but I will knock them through the fucking wall if that's what it takes.

Block subsequently called DCS and advised that the Children were in danger of harm. After this episode, Mother went back to two medications she had previously taken. Block, in the following exchanged, testified as to Mother's mental health:

> Q:  I believe you stated before that frequently a person with a personality disorder would feel better, would go off their medications, would stop counseling?
>
> A:  Uh-huh.
>
> Q:  Have you seen a similar pattern in [Mother]?
>
> A:  Yes.
>
> Q:  Is there any reason to believe that that pattern will not recur?
>
> A:  I can't guarantee that it wouldn't happen again, no.
>
> Q:  In the course of your treatment with [Mother], did she appear more or less stressed when the children were with her or not with her?
>
> A:  She appeared less stressed when they were not with her.

Block testified that Mother likely would require medication management and individual counseling for the rest of her life.

Sarah K. ("Grandmother") testified. It was Grandmother that Mother and the Children lived with during the trial home visit. According to Grandmother, the trial home visit initially went well. As the holidays approached, however, the situation began to deteriorate. Mother used harsh language with the Children, telling them to "shut their effing mouth." Grandmother also stated that once, Mother told the Children that "one day they

-4-

would come in and find me murdered in the bed and blood everywhere." Grandmother testified that Mother had suffered from mental health problems for much of her life.

Barbara Mayer ("Mayer") testified. Mayer, a foster care case manager with DCS, testified as to how Block told her certain comments made by Mother about the Children. It was Mayer's testimony that Block told her the following:

> [Mother] said she hated those fucking evil kids, referring to [the Children]; that she hated going home because they were there; that they wouldn't mind and she was going to knock them through the walls; that she had told them in front of the grandmother that one day they're going to wake up and find the grandmother dead in her bed with blood everywhere; that she felt like at times killing herself - - and that was also an original reason for custody.

Mayer stated that Block's call had "an extreme sense of urgency," which got her attention. Meanwhile, Mayer testified that the Children were doing "extremely well" in their new foster home and did not ask about Mother.

Mother testified again. Mother stated that she had made great strides since the filing of the petition to terminate parental rights. Mother, however, did acknowledge yelling and cursing at the Children during the trial home visit. Mother testified that she felt her statements to Block were twisted, and this was a betrayal of sorts as Mother thought Block was there to help her. It was Mother's testimony that over the course of her struggle with mental illness, some medications had worked and others had not. Mother denied any illicit drug use since the removal of the Children.

After the trial, in August 2012, the Juvenile Court entered its detailed order terminating Mother's parental rights to the Children. The Juvenile Court denied Mother's motion to dismiss, finding that the delay between the hearing dates did not prejudice Mother:

> The Court found that the Respondent's Motion to Dismiss should be denied. The Court further found the case was simply suspended and continued until another day when all parties could get a day on the calender that wasn't in conflict. At some point after that the department, recognizing the testimony from that day that [Mother] was doing well, decided that since the case was going to be continued anyway, to let her have some time. The Department was making reasonable efforts to try to help her rehabilitate the circumstances that led to the removal and led to the filing of the termination petition. That process continued through the Juvenile Court supervised by Magistrate Smith, and at one point in the DCS was just a couple weeks from returning the

children to [Mother's] custody. Before divestment, a circumstance developed that relates back to the grounds that caused the original removal and the petition to be filed, at which point DCS decided to continue with the termination proceeding.

The Court found yesterday and also finds today that the delay in getting the second day of hearing was not any effort by the state to prejudice [Mother] but to the contrary, to benefit her. When that effort failed, the department had only two choices: to proceed with this termination that we already had a full day of hearing on in which proof would not change, or start over. The Court further finds that had there been any new grounds added, then certainly [Mother's] due process rights would have been affected and she would certainly be entitled to protection of the rights to notice and the ability to prepare. The Court finds that if the circumstances and proof today do not justify termination under the grounds originally alleged, then the Court will so find. The department says that there are no new grounds and that it's simply going to be a continuation of the proof as to the original grounds. Just as anything in the case that happened between the filing of the petition and the first hearing would be admissible, anything significant that happened between the first and second hearings is admissible. Despite the long delay, the Court does not find that any due process rights are being violated because the original grounds are what's being attempted to be proved by the department.

After the motion was denied, DCS presented Juvenile Court records, which were created after the June 29, 2011, hearing. The records showed that, during DCS and [Mother] continued to work on the plan and a trial home visit began on October 31, 2011. DCS also offered a February 8, 2011, case note concerning [Mother's] progress in therapy; progress notes taken by Ms. Block of therapy sessions she had with [Mother] since June 29, 2011; and permanency plans created by DCS on July 20, 2010, and January 18, 2011 treatment as exhibits. DCS offered testimony from Sarah [K.], [Mother's] mother; Ms. Mayer; Ms. Block and [Mother].

Later in the order, the Juvenile Court made its thorough findings of fact and conclusions of law[2], which we reproduce in relevant part, as reformatted:

---

[2]The Juvenile Court found that DCS did not meet its burden of proof with respect to two other grounds for termination, namely those of substantial noncompliance with a permanency plan and abandonment for failure to provide the Children with a suitable home. We will focus on the ground for
(continued...)

3. The state proved by clear and convincing evidence that the conditions that led to the children's original removal – [Mother's] drug abuse, her mental instability, her financial instability and her lack of a stable home for the children – specifically her mental instability – persist, pursuant to T.C.A. §§ 36-1-113(g)(3). DCS alleged that it has been 18 months since the children were removed, as of the time of the filing of this petition, and that those conditions persisted, that there is no chance that the conditions will be remedied soon so that the children can be returned safely to the home; and the continuation of this relationship diminishes the children's chance of being in a safe, stable and permanent home. This ground is much for problematic for [Mother]. At trial on March 21, 2012, there was no evidence offered that she had not addressed her drug abuse – except her own statement to Ms. Block. She does have a job. She had a stable home for some time, and she has a home that would probably be a physically safe and stable place for the children. But the big issue is the mental instability.

The testimony I've heard is that this problem has existed since she was a teenager. There have been hospitalizations, multiple doctors, and a long list of the medications she has taken, and none of them have worked for a long period of time. Ms. Block testified in June 2011 about how well [Mother] was doing, and her testimony was a major factor in the decision by DCS giving her one more chance. On March 21, 2012, she testified about the incident that led to her call to DCS due to her concern for the children's safety. She also testified that [Mother] has several new diagnoses. She said that, given these diagnoses, [Mother] will need lifetime treatment. Hopefully, the correct medications and counseling eventually will make [Mother] stable. She has said that she will keep trying. Candidly, however, the Court just doesn't know that that will ever happen. The Court must balance [Mother's] needs with the needs of the children. Specifically, the condition of mental instability and the problems that causes and the safety concerns it causes, leads the Court to find that the department has shown by clear and convincing evidence, given the long, long history and the uncertainty of the future, that there is little chance those conditions will be remedied soon so that the children can be safely returned to the home and that condition does diminish the chances of the children being placed in a safe stable and loving home.

---

[2](...continued)
termination of parental rights that the Juvenile Court did find to exist by clear and convincing evidence, that of persistent conditions.

4. As to the issue of whether termination of [Mother's] parental rights is in the best interests of the children, the Court has weighed the factors set forth in T.C.A. 36-1-113(i), as is set out below:

As to adjustment of circumstances, the Court finds that [Mother] has done all she could. I think [Mother] has quit drugs, got a job, and has done her best to provide the children with a good physical home. However, although not necessarily her fault, the mental health issues underlying all the other problems have not been satisfactorily addressed. As to failing to effect a lasting adjustment after reasonable efforts and they do not reasonably appear possible, the Court finds that this condition is sort of beyond the control of [Mother], but the long history shows that there is no reasonable likelihood that's going to change in the short term. As to regular visitation or contact, the Court finds this has certainly been done and favors against termination. As to whether a meaningful relationship has been established, the Court finds that there is certainly a strong bond and that would favor against termination. As to the effect of the change of caretakers is likely to have on the children's emotional, psychological, and medical condition, the Court finds that the children have been in foster care twice now, that they should not be left in foster care until there is another stable period, and that they do not need further instability and that factor favors termination. As to brutality, physical or sexual abuse, or neglect, the Court finds that some of the language that has been used in front of the children could rise to emotional or physical abuse, but the Court has heard no testimony that it has had that effect on these children, and as such, that factor is neutral but the Court would not favor putting the children in that atmosphere again. As to the physical environment being healthy and safe, the Court finds that to have never been an issue and is neutral. As to whether [Mother's] mental and emotional status would be detrimental to the child or prevent [Mother] from effectively providing safe and stable care and supervision, the Court finds that it simply does not and cannot know whether that issue can be addressed in any reasonable length of time, and that the history of the case indicates that it will not be addressed. As to the issue of child support, the Court finds that issue to have never been raised.

After considering the aforementioned factors, the Court finds that the DCS has proven by clear and convincing evidence that it is in the children's best interest for [Mother's] parental rights to be terminated and the children made available for adoption.

Mother appeals to this Court.

## Discussion

Though not stated exactly as such, Mother raises three issues on appeal: 1) whether the Juvenile Court erred in finding that the ground of persistent conditions had been proven to terminate Mother's parental rights to the Children; 2) whether the Juvenile Court erred in finding that it was in the Children's best interest for Mother's parental rights to be terminated; and, 3) whether the Juvenile Court violated Mother's due process rights by delaying the proceedings in this case for several months before concluding the trial.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first address whether the Juvenile Court erred in finding and holding that the ground of persistent conditions existed to terminate Mother's parental rights to the Children pursuant to Tenn. Code Ann. § 36–1–113 (g)(3). The statute provides in pertinent part:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

\*\*\*

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;....

Tenn. Code Ann. § 36-1-113 (g) (Supp. 2012).

The Trial Court held, by clear and convincing evidence, that the ground of persistent conditions existed to terminate Mother's parental rights to the Children. In so doing, the Trial Court based its holding, in part, on Mother's long history of mental health problems and their apparent permanence for Mother. On appeal, Mother argues, among other things, that she substantially complied with the permanency plan, and that, in this case, the facts underlying the ground of substantial noncompliance with a permanency plan overlaps with persistent conditions. In effect, according to Mother, as the Juvenile Court held that DCS failed to prove its burden as to the ground of substantial noncompliance with a permanency plan, it should have held the same for the ground of persistent conditions.

We disagree with Mother. Persistent conditions is a distinct ground for termination of parental rights. An individual could fully comply with a permanency plan and yet the conditions which led to the removal or other such conditions in that individual's case might yet persist. Conversely, an individual could have rectified the conditions which led to removal while blatantly defying some of the requirements of a permanency plan. These simply are distinct grounds for termination of parental rights.

We acknowledge, as did the Trial Court, certain progress Mother made. We also acknowledge Mother's substantial adherence to her permanency plan through her efforts to treat her mental illness. That, however, is not the issue here. The issue is the persistence of conditions which led to the removal of the Children—namely, Mother's mental health problems, especially as manifested in these vitriolic outbursts in front of and often about the Children.

We do not believe that Mother's reported verbal outbursts regarding and to the Children are a mere blip in the course of overall progress. Rather, Mother's extreme rhetoric, and the subsequent breakdown of the trial home visit, represent serious matters. These events demonstrate clearly and convincingly that, unfortunately, Mother's mental health problems, a central basis for the original removal, remain an ongoing problem. The evidence in the record on appeal reflects that Mother has suffered from mental health problems for

many years over the course of her life. It is far from clear that Mother ever can overcome these mental health problems. The Juvenile Court found by clear and convincing evidence that there was little chance that Mother's mental instability and the related problems and safety concerns could be remedied any time soon. The Juvenile Court found this to be so despite the reasonable efforts of DCS and Mother. As this Court has held:

> "[A] parent's continued inability to provide fundamental care, even though not willful, whether caused by mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care. Where, as here, efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified."

*In re T.S. and M.S.*, M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000), *rule 11 appl. perm. appeal denied December 11, 2000.*

Based on the record before us, it is clear that Mother will not be in a position to take on the role of parent to the Children any time in the near future. From our review of the record before us, we find that the Juvenile Court's findings made under the clear and convincing standard as relevant to the issue of persistent conditions are supported by a preponderance of the evidence. The Juvenile Court did not err in finding and holding that clear and convincing evidence existed that grounds were proven to terminate Mother's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113 (g)(3).

We next consider whether the Juvenile Court erred in finding and holding that it was in the Children's best interest for Mother's parental rights to be terminated. The relevant statutory provision is Tenn. Code Ann. § 36-1-113 (i), which provides:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113 (i) (Supp. 2012).

The Juvenile Court conducted a detailed best interests analysis as set forth above, and we find no basis to disturb the detailed finding of the Juvenile Court as to this issue. The evidence in the record on appeal does not preponderate against the Juvenile Court's findings made by clear and convincing evidence that it is in the Children's best

interest for Mother's parental rights to be terminated. We affirm the Juvenile Court's finding that it is in the best interest of the Children for Mother's parental rights to be terminated.

Finally, we address whether the Juvenile Court erred in delaying the proceedings in this case for several months before concluding the trial. Mother argues that her due process rights under the Tennessee Constitution and Federal Constitution were violated as a result of the long delay and apparent reversal of position by DCS.

We find this issue to be without merit. If anything, the delay served to assist Mother by granting her an opportunity for an extended trial home visit with the Children. As discussed previously, this trial home visit was a failure. The fact that the trial home visit ended poorly in no way gives rise to any violation of Mother's due process rights. In any case, no new grounds for termination were alleged at the second hearing date. Mother's attorney was present at the January 17, 2012 hearing on DCS's motion to terminate the trial home visit. Mother's attorney also received a copy of the order ending the trial home visit. Mother and her attorney were aware prior to the resumption of the trial of both the grounds for termination raised by DCS and the evidence relevant to these grounds relied on by DCS. Mother simply has no basis for contending that her due process rights, under either the Tennessee Constitution or Federal Constitution, were violated by the delay in the trial in this case.

We find and hold that the Juvenile Court did not err in terminating Mother's parental rights to the Children. We, therefore, affirm the Juvenile Court's judgment terminating Mother's parental rights to the Children.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Jennifer K., and her surety, if any.

_____
D. MICHAEL SWINEY, JUDGE